[Cite as *Chawla v. Chawla*, 2014-Ohio-1188.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Rakesh R. Chawla, | : | |
| Plaintiff-Appellant/ Cross-Appellee, | : | |
| | : | No. 13AP-399 |
| v. | | (C.P.C. No. 10DR-03-1335) |
| | : | |
| Jyoti R. Chawla, | : | (REGULAR CALENDAR) |
| Defendant-Appellee/ Cross-Appellant. | : | |
| | : | |

D E C I S I O N

Rendered on March 25, 2014

*Gary J. Gottfried Co.*, *L.P.A.*, *Gary J. Gottfried*, and *Eric M. Brown*, for appellant/cross-appellee.

*Wolinetz Law Offices*, *LLC*, and *Barry H. Wolinetz*, for appellee/cross-appellant.

APPEAL from the Franklin County Court of Common Pleas,
Division of Domestic Relations

SADLER, P.J.

{¶ 1} Plaintiff-appellant/cross-appellee, Rakesh R. Chawla, appeals from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, granting a divorce and terminating his marriage to defendant-appellee/cross-appellant, Jyoti R. Chawla. For the reasons that follow, the trial court's judgment is affirmed.

I. BACKGROUND

{¶ 2} The parties were married on April 29, 2000, and three children were born as issue of the marriage. The children's respective dates of birth are February 24, 2003,

December 23, 2005, and January 3, 2008. Appellant filed a complaint for legal separation on March 25, 2010, and appellee's answer and counterclaim for divorce was filed on April 15, 2010. The trial court appointed a guardian ad litem ("GAL") to represent the interests of the minor children during the proceeding.

{¶ 3} Appellant and appellee are both physicians, and, at the time of trial, appellant, an interventional cardiologist, was employed by Cardiovascular Consultants of Cleveland, Inc. Appellant's primary residence was in Solon, Ohio, but appellant maintained a small apartment in Dublin, Ohio to facilitate parenting time with the children. Appellee, a doctor of internal medicine, held two part-time positions, one as an emergency facility physician and one as a hospitalist. Temporary orders in this case were first issued on July 27, 2010. As is pertinent to this appeal, both parents were designated temporary residential parents and legal custodians of the three children, and the parties were provided with a possession schedule. Additionally, appellant was ordered to pay child support in the amount of $3,600 per month and spousal support in the amount of $4,000 per month, including all associated processing charges.

{¶ 4} Appellant filed various motions to modify the temporary orders, which resulted in the modification order of May 9, 2011. The primary modifications in the order pertained to child and spousal support amounts. Specifically, the May order provided that, from August 10, 2010 to May 9, 2011, appellant's child support obligation was $253.97 per child per month. From May 9, 2011 and ongoing, depending upon whether private health insurance was in effect, the child support obligation was either $712.93 or $698.72 per child per month. From August 10, 2010 to May 9, 2011, the spousal support obligation was determined to be $1,000 per month. From May 9, 2011 and ongoing, the spousal support obligation was determined to be $3,000 per month.

{¶ 5} The matter came for trial in early January 2013. On April 16, 2013, the trial court issued its judgment entry and decree of divorce that granted a divorce and addressed the disputed issues between the parties. The trial court concluded the dates of the marriage were from April 29, 2000 to January 9, 2013, and assets and liabilities were valued as of September 30, 2012. Though the trial court divided all of the parties' assets and liabilities, this appeal concerns the trial court's decision regarding (1) a condominium in Louisiana, (2) a PNC line of credit, (3) appellee's alleged financial misconduct with

respect to real estate in Mississippi, (4) marital funds expended on appellee's father's legal defense in an unrelated matter, (5) child support computation, and (6) an award of attorney fees.

{¶ 6}   The condominium, located in New Orleans, Louisiana, was purchased by appellee and her brother in 1992.   The trial court determined appellee's 50 percent interest in the condominium was appellee's separate property upon which no marital funds were expended, and, therefore, none of appellee's equity in the real estate was subject to division as a marital asset.

{¶ 7}   The PNC line of credit relates to appellant's business interest in his former practice, Cardiovascular Care Unlimited.  Appellant testified this line of credit was used to pay for the balance owed on the practice when he purchased it.   The trial court determined the PNC line of credit with a balance of $57,636.92, and for which appellant is personally liable, was a marital liability.

{¶ 8}   During these proceedings, appellant also alleged appellee engaged in financial misconduct with respect to real estate located in Mississippi that was purchased by appellee's parents in 1998.  Several years prior to the initiation of this domestic matter, a 33 percent interest in the real estate was transferred to appellee from her parents. Appellee admittedly expended marital funds on the real estate without appellant's knowledge.   According to appellant, he was unaware of appellee's investments in the property until mid-2004.   Because of appellant's displeasure with the investment, in October 2004, the property was transferred into VCR I, LLC.  In 2007, appellee's parents gave appellee $115,000 for the purchase of her home.   According to appellee, the $115,000 was to compensate her for her interest in VCR I, LLC that she transferred to her parents seven months later.  Despite appellant's urging to the contrary, the trial court did not find appellee engaged in financial misconduct or that appellant was otherwise entitled to equitable relief with respect to this property.

The trial court also considered marital funds appellee contributed to her father's legal defense.[1]   The trial court concluded appellee, without appellant's knowledge,

---

[1] In a separate action in the state of Georgia, appellee's father was indicted and convicted for the contract murder of his granddaughter's mother.

contributed approximately $224,931 to her parents for her father's legal bills. While expressly declining to consider this financial misconduct, the trial court did find appellant was entitled to equitable relief and deemed these funds to be appellee's asset for purposes of property division.

## II. ASSIGNMENTS OF ERROR

{¶ 9} Appellant appeals and assigns four assignments of error for our review:

[I.] The trial court erred and abused its discretion in calculating Appellant's child support obligation effective January 1, 2013.

[II.] The trial court erred and abused its discretion in failing to make a finding of financial misconduct with respect to Appellee's transaction(s) regarding her investment in real estate in Mississippi.

[III.] The trial court erred and abused its discretion in concluding that Appellee had proven by a preponderance of the evidence that the condominium in Louisiana was her separate property.

[IV.] The trial court erred and abused its discretion when it awarded $40,000 in legal fees to Appellee.

## III. CROSS-ASSIGNMENTS OF ERROR

{¶ 10} Appellee filed a cross-appeal and asserts the following assignments of error for our review:

I. The trial court erred and abused its discretion when it found that the balance of the PNC line of credit subject to marital distribution is $57,636.92.

II. The trial court erred and abused its discretion when it included $224,931 given to wife's parents as an asset to wife.

## IV. DISCUSSION

### A. First Assignment of Error

{¶ 11} In his first assignment of error, appellant challenges the trial court's calculation of child support. The trial court determined that effective January 1, 2013, appellant's child support obligation was $3,055.56 per child, per month, plus 2 percent processing charge for a total of $9,350.01 per month. In arriving at this amount, the trial

court reviewed in detail appellant's employment history since 2008 and imputed an annual income of $550,000 to appellant. According to appellant, the trial court erred in imputing income and awarding an amount of child support in excess of the calculated guideline amount.

{¶ 12} A trial court has considerable discretion in the calculation of child support, and, absent an abuse of discretion, an appellate court will not disturb a child support order. *Pauly v. Pauly*, 80 Ohio St.3d 386 (1997). A trial court abuses its discretion when it acts in an unreasonable, arbitrary or unconscionable manner. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). There is no abuse of discretion where there is some competent, credible evidence supporting the trial court's decision. *Ross v. Ross*, 64 Ohio St.2d 203 (1980).

{¶ 13} It is undisputed that the parties' combined gross income exceeds $150,000. Under such circumstances, the court must calculate the child support obligation on a case-by-case basis and must consider the needs and the standard of living of the children and of the parents in doing so. *Guertin v. Guertin*, 10th Dist. No. 06AP-1101, 2007-Ohio-2008, ¶ 4. R.C. 3119.04(B) provides that "[i]f the combined gross income of both parents is greater than one hundred fifty thousand dollars per year, the court, with respect to a court child support order, * * * shall determine the amount of the obligor's child support obligation on a case-by-case basis and shall consider the needs and the standard of living of the children who are the subject of the child support order and of the parents." The statute further provides that "[t]he court * * * shall compute a basic combined child support obligation that is no less than the obligation that would have been computed under the basic child support schedule and applicable worksheet for a combined gross income of one hundred fifty thousand dollars, unless the court * * * determines that it would be unjust or inappropriate and would not be in the best interest of the child, obligor, or obligee to order that amount." The statute mandates that should the court make "such a determination, it shall enter in the journal the figure, determination, and findings."

{¶ 14} Thus, in cases where the parties' combined income exceeds $150,000, the court is bound by three requirements. The court must: (1) set the child support amount

based on the qualitative needs and standard of living of the children and parents, (2) ensure that the amount set is not less than the $150,000-equivalent, unless awarding the $150,000-equivalent would be inappropriate (i.e., would be too much), and (3) if it decides the $150,000-equivalent is inappropriate or unjust (i.e., awards less), then journalize the justification for that decision. *Kuper v. Halbach*, 10th Dist. No. 09AP-899, 2010-Ohio-3020, ¶ 84, citing *Zeitler v. Zeitler*, 9th Dist. No. 04CA008444, 2004-Ohio-5551, ¶ 8.

{¶ 15} Appellant does not dispute either that the trial court conducted a case-by-case determination as required by R.C. 3119.04(B) or that the trial court expressly considered the statutory factors of R.C. 3119.23.[2] Rather, appellant contends the trial court abused its discretion in awarding child support in excess of the calculated guideline amount without "any such express finding" that the guideline amount of child support would be "unjust and inappropriate and not in the best interest of the children." (Appellant's brief, 26.)

{¶ 16} In support of his proposition that such finding was required, appellant relies on *Wolfe v. Wolfe*, 10th Dist. No. 04AP-409, 2005-Ohio-2331. In that case, child support was calculated under R.C. 3119.04, and the trial court utilized the statutory factors of R.C. 3119.23. The trial court also made findings under R.C. 3119.22, i.e., that the guideline amount of child support was unjust, inappropriate, and not in the best interest of the children when it awarded child support in an amount in excess of the guideline amount. While the *Wolfe* decision mentioned that the trial court made such findings, the decision did not hold that in cases concerning combined incomes exceeding $150,000 and child support being calculated pursuant to R.C. 3119.04(B), findings under R.C. 3119.22 were *required*. What is more, this court has explicitly held that "R.C. 3119.04(B) 'does not require any explanation of [the trial court's] decision unless it awards less than the amount awarded for combined incomes of $150,000.' " *Guertin* at ¶ 6, quoting *Cyr v. Cyr*, 8th Dist. No. 84255, 2005-Ohio-504, ¶ 56. *See also Lanham v. Mierzwiak*, 197 Ohio App.3d 426 (6th Dist.2011) (because the amount of child support established under R.C.

---

[2] "While the trial court was not required to consider the factors pursuant to R.C. 3119.23, it is not an abuse of discretion to do so in addition to computing the child support obligation on a case-by-case basis in accordance with R.C. 3119.04(B)." *Wolfe v. Wolfe*, 10th Dist. No. 04AP-409, 2005-Ohio-2331, ¶ 28.

3119.04(B) was not less than the $150,000 equivalent, the trial court was not required to make any findings).

{¶ 17} Appellant also argues that, despite the trial court's findings to the contrary, the evidence reflects the parties did not live an extravagant lifestyle prior to the divorce and the children's lifestyles were not affected by the divorce proceedings or the parties' separation.  The trial court's decision reflects that the court considered the needs and standard of living of the children and the parties in calculating the child support obligation.  The trial court noted that appellee will bear the primary cost of the children's extracurricular activities, and "incurs significant in-kind contributions to maintain the children in the lifestyle they would have enjoyed had their parents remained married," such as work at a Hindu temple, chess club, piano lessons, and sports.  (Decree, 38.)

{¶ 18} Further, the trial court concluded that, while the parties have both lived "relatively frugal lifestyles despite their significant incomes," the children "have lived a very comfortable life and have experienced the full benefit of living in an upper middle class neighborhood and excellent educational and extracurricular opportunities." (Decree, 38.)  The trial court also noted the children were enrolled in private school at the time of the parties' separation, but have since been removed due to appellant's refusal to continue to contribute to the expense.  The trial court concluded, "[t]he children would have likely remained in private schools but for the parties' divorce."  (Decree, 39.)  Each of the trial court's findings are supported by the record.

{¶ 19} Appellant also suggests the trial court established appellant's child support obligation in order to "equalize the parties' incomes" and award de facto spousal support. (Appellant's brief, 29.)  According to appellant, this is demonstrated by the fact that the temporary orders provided for child support and spousal support to continue until January 1, 2013, at which time the court ordered appellant to pay no spousal support, but a significantly increased amount of child support.

{¶ 20} While a court must take care not to award child support as a substitute for spousal support when the latter terminates, the termination of spousal support does factor into the child support calculation because, in computing the child support obligation, the trial court must deduct spousal support from the income of the obligor and include it as income for the obligee.  *Ellis v. Ellis*, 7th Dist. No. 08 MA 13, 2009-Ohio-

4964, ¶ 69, citing *Wright v. Wright*, 8th Dist. No. 91026, 2009-Ohio-128, ¶ 30. Additionally, this case presented a scenario in which the parties' combined incomes well exceeded $150,000, such that the trial court was not bound by the child support worksheets and was *required* to assess appellant's child support obligation on an individual, case-by-case basis. Additionally, the parties' circumstances at the time the court issued temporary orders were different than they were at the time of divorce, including appellant's income, the termination of spousal support, and the respective amounts of parenting time and obligations. Upon review of the record, we discern no abuse of discretion in the trial court's order of child support in an amount in excess of the calculated guideline amount.

{¶ 21} Next under this assigned error, appellant contends the trial court abused its discretion in imputing an annual income of $550,000 to appellant when there was no evidence that he was voluntarily underemployed.

{¶ 22} A trial court must determine the parents' income in order to calculate child support. Pursuant to R.C. 3119.01(C), income for purposes of determining child support includes the gross income of the parents and any "potential income" of a parent if that parent is voluntarily unemployed or underemployed. *Apps v. Apps*, 10th Dist. No. 02AP-1072, 2003-Ohio-7154, ¶ 46. Whether a parent is voluntarily unemployed or underemployed is a determination within the trial court's discretion and will not be disturbed absent an abuse of discretion. *Banchefsky v. Banchefsky*, 10th Dist. No. 09AP-1011, 2010-Ohio-4267, ¶ 8, citing *Rock v. Cabral*, 67 Ohio St.3d 108, 112 (1993).

{¶ 23} Before a trial court may impute income to a parent, the court must make a finding that the parent is voluntarily unemployed or underemployed. *Apps* at ¶ 48, citing *Leonard v. Erwin*, 111 Ohio App.3d 413, 417 (4th Dist.1996). Once a party is determined to be voluntarily unemployed or underemployed, the potential income to be imputed to that party must be determined in accordance with the considerations listed in R.C. 3119.01(C)(11). *Id.* Consideration of the factors set forth in R.C. 3119.01(C)(11) is mandatory, and the trial court's failure to consider these factors constitutes an abuse of discretion. *Id.*, citing *Badovick v. Badovick*, 128 Ohio App.3d 18, 23 (8th Dist.1998). A trial court must weigh the facts and circumstances of each particular case in determining

whether a parent is voluntarily underemployed. *Bruno v. Bruno*, 10th Dist. No. 04AP-1381, 2005-Ohio-3812, ¶ 16, citing *Rock.*

{¶ 24} As provided in R.C. 3119.01(C)(11):

"Potential income" means both of the following for a parent who the court pursuant to a court support order, or a child support enforcement agency pursuant to an administrative child support order, determines is voluntarily unemployed or voluntarily underemployed:

(a) Imputed income that the court or agency determines the parent would have earned if fully employed as determined from the following criteria:

(i)  The parent's prior employment experience;

(ii)  The parent's education;

(iii)  The parent's physical and mental disabilities, if any;

(iv)  The availability of employment in the geographic area in which the parent resides;

(v)  The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi)  The parent's special skills and training;

(vii)  Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x)  The parent's decreased earning capacity because of a felony conviction;

(xi)  Any other relevant factor.

(b) Imputed income from any nonincome-producing assets of a parent, as determined from the local passbook savings rate or another appropriate rate as determined by the court or

agency, not to exceed the rate of interest specified in division (A) of section 1343.03 of the Revised Code, if the income is significant.

{¶ 25} Appellant contends the trial court summarily imputed income to him without expressly finding that he was voluntarily underemployed at the time of trial and without consideration of the "any other relevant factor" of R.C. 3119.01(C)(11)(a)(xi). According to appellant, had the trial court considered the "any other relevant factor," it would have considered that appellant's $550,000 employment offer had unmet contingencies and that appellee had previously sabotaged appellant's employment offers.

{¶ 26} The trial court devoted four pages of its 60-page divorce decree to determining the incomes and relative earning abilities of the parties. The bulk of the trial court's discussion pertained to appellant because of the variations in his income throughout the last several years of the parties' marriage. The trial court detailed the evidence pertaining to appellant's employment from 2008 through 2012, including a March 2010 employment offer, which appellant accepted, that included an annual income of $550,000. The trial court also recognized the employer's withdrawal of this offer due to appellee's interference with said employment prospect. Thus, contrary to appellant's assertion, the trial court expressly recognized appellee's previous attempts to sabotage appellant's ability to change employment, particularly in 2009 and 2010. In relevant part, the trial court stated:

> Fortunately, as indicated above, [appellant] appears to have weathered this storm and is successfully exploring other employment opportunities in northern Ohio, Cleveland, Ohio and in Indiana. In fact, [appellant] has applied for and been granted licenses for medical practice privileges and to distribute narcotics in Indiana, where he now has an offer pending for full time employment for $550,000. Therefore considering the [appellant's] prior employment experience and earning history, his education, the availability of employment in the geographic area which the [appellant] resides and within approximate same distance from the children's residence, the fact that [appellant] has historically sought employment in other geographic areas, the prevailing salary levels in Ohio and neighboring states, the [appellant's] special skills and training, the evidence supporting the fact that [appellant] has the ability, is currently offered the

> imputed income and the [appellant's] increased earning capacity because of his experience, the Court finds that [appellant's] earning ability as of January 1, 2013 is $550,000.

(Decree, 33-34.)

{¶ 27} In support of his position that the trial court abused its discretion by making no explicit finding that he was voluntarily underemployed, appellant relies primarily on *Banchefsky*, *Apps*, and *Bruno.* In those cases, and as mentioned previously in this decision, this court has stated that, before a trial court imputes income to a parent, it must first find that the parent is voluntarily unemployed or underemployed.

{¶ 28} In *Apps*, this court held that the trial court abused its discretion in imputing income to the appellant where the trial court summarily imputed an $18,000 gross income without an explicit finding of voluntary underemployment or unemployment, without any consideration of the factors set forth in R.C. 3119.01(C)(11), and without any rationale for imputing the $18,000 gross income. Similarly, in *Bruno*, not only was an express finding of voluntary underemployment absent from the trial court's order, but, also, this court found there was no evidence in the record to support a finding of voluntary underemployment.

{¶ 29} Unlike *Apps* and *Bruno*, the record before us demonstrates that the trial court clearly considered the requisite factors of R.C. 3119.01(C)(11) and provided its rationale for the imputed income of $550,000. Additionally, the trial court's discussion of appellant's employment history reveals a 2008 business income of $786,028, and a 2011 to 2012 employment contract with Cardiovascular Consultants of Cleveland providing for a $350,000 salary for the first year and a $35,000 possible bonus for each $100,000 earned over $900,000, plus shareholder eligibility and automobile, home, and cell phone expenses. The trial court also discussed appellant's 2010 employment offer of $550,000 to work in Montana and the subsequent withdrawal of the offer due to appellee's interference. The trial court concluded from appellant's 2010 and 2011 tax returns that his income for those years was $204,987 and $226,303, respectively. Appellant did not produce tax returns, 1099s or W2s for 2012 and, according to the trial court, was "not forthcoming with accounts receivables he may have received during 2012." (Decree, 31.)

Nonetheless, from an earning statement, the trial court deduced appellant's income was approximately $251,923.13.

{¶ 30} Additionally, this record contains evidence to support a finding of voluntary underemployment. Appellant testified at trial that he was earning only $200,000 annually. From the trial court's detailed discussion of appellant's employment history, though the specific words "voluntarily underemployed" were not used, the trial court clearly concluded such based on the evidence appellant was indeed voluntarily underemployed. *Thaher v. Hamed*, 10th Dist. No. 09AP-970, 2010-Ohio-5257 (specific words "voluntarily underemployed" not required where it is clear the trial court concluded that, based on the evidence, the obligor was voluntarily underemployed); *Snyder v. Snyder*, 5th Dist. No. 2008CA00219, 2009-Ohio-5292 (no magic language requirement in deciding whether one is voluntarily underemployed/unemployed); *Winkleman v. Winkleman*, 11th Dist. No. 2008-G-2834, 2008-Ohio-6557 (implicit in the trial court's decision was that the parent was voluntarily unemployed).

{¶ 31} Appellant also asserts the trial court failed to consider "any other relevant factor" of R.C. 3119.01(C)(11)(a)(ii) because the court did not consider the "contingencies" associated with the current $550,000 employment offer in Indiana. A review of appellant's testimony, however, indicates appellant did not testify as to these alleged contingencies. At trial, appellant testified that he had in his possession a written offer from an Indiana hospital for a permanent full-time position offering a $550,000 annual salary with the potential for amounts above that. Appellant was not forthcoming about the specifics regarding the offer, and when asked if he would be producing the employment contract, appellant replied "no." (Tr. Vol. III, 693.)

{¶ 32} After a thorough review of the record, we do not find that the trial court abused its discretion in calculating appellant's child support obligation effective January 1, 2013. Accordingly, we overrule appellant's first assignment of error.

**B. Second Assignment of Error**

{¶ 33} In his second assignment of error, appellant contends the trial court abused its discretion in failing to find appellee engaged in financial misconduct regarding her investment in real estate located in Mississippi.

{¶ 34} In divorce proceedings, a trial court must classify property as marital or separate property. R.C. 3105.171(B). Then, the trial court must divide the marital property equally or, if an equal division is inequitable, the court must divide the marital property equitably. R.C. 3105.171(C)(1); *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, ¶ 5. A trial court has broad discretion in the allocation of marital property, and an appellate court will not disturb its judgment absent an abuse of discretion. *Id.*

{¶ 35} A court may find an equal division of marital property inequitable if one spouse demonstrates that the other has committed financial misconduct. "If a spouse has engaged in financial misconduct, including, but not limited to, the dissipation, destruction, concealment, nondisclosure, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property." R.C. 3105.171(E)(4). Financial misconduct occurs when one spouse engages in some type of knowing wrongdoing, by which the spouse either profits or intentionally interferes with the other spouse's property rights. *Taub v. Taub*, 10th Dist. No. 08AP-750, 2009-Ohio-2762, ¶ 33; *Heller v. Heller*, 10th Dist. No. 07AP-871, 2008-Ohio-3296, ¶ 27; *Hamad v. Hamad*, 10th Dist. No. 06AP-516, 2007-Ohio-2239, ¶ 62. This court has affirmed findings of financial misconduct where a spouse has violated the court's restraining orders; dissipated marital assets without the knowledge or permission of the other spouse; stole equipment, inventory, and records of the other spouse's business so as to interfere with the business's continued operation; cashed an insurance check and used the proceeds for the spouse's own purposes; and sold stock owned by the other spouse, without that spouse's knowledge or permission. *Id.* (listing examples); *Galloway v. Khan*, 10th Dist. No. 06AP-140, 2006-Ohio-6637, ¶ 27 (same).

{¶ 36} The complaining spouse bears the burden of proving financial misconduct. *Heller* at ¶ 27; *Hamad* at ¶ 61; *Galloway* at ¶ 26. The trial court has discretion in determining whether financial misconduct occurred, and an appellate court will only reverse that determination if it is against the manifest weight of the evidence. *Heller* at ¶ 27; *Hamad* at ¶ 61; *Parker v. Parker*, 10th Dist. No. 05AP-1171, 2006-Ohio-4110, ¶ 12.

{¶ 37} Oftentimes, the time frame when marital funds are dissipated is a relevant factor in determining an inference of wrongdoing or misconduct, especially when the dissipation occurs during the parties' separation. *Logan v. Logan*, 10th Dist. No. 03AP-

225, 2003-Ohio-6559, ¶ 22, citing *Hammond v. Brown*, 8th Dist. No. 67268 (Sept. 14, 1995). However, every factual scenario is different, and we have not said, as a matter of law, that a court errs in finding financial misconduct in the unilateral dissipation of marital funds, which occurred during the marriage and prior to separation. *Id.*

{¶ 38} In the case at bar, appellant does not dispute that in 1998 appellee's parents purchased 44.90 acres of land in Mississippi for $1,000,000. The purchase was financed by a mortgage and loan against the property. According to the record, appellee's parents transferred a 33 percent interest in the land to appellee in 2004. At that time, appellee began financially contributing to the property, and appellee admits she did not discuss the investment with appellant prior to making the financial contributions. Appellant became aware of appellee's investments, and this issue became a source of contention between the parties. According to appellee, because of appellant's objection to her involvement with the property, in October 2004, she and her parents transferred the land into VCR I, LLC. The evidence at trial established that appellee invested anywhere from $65,000 to $140,000 in the property.

{¶ 39} In November 2007, appellee's parents gave appellee $115,000 with which to purchase a home, and in June 2008, appellee assigned her interest in VCR I, LLC to her parents. The trial court expressly found credible appellee's testimony that the $115,000 from her parents was for any interest appellee had held in VCR I, LLC. All of this activity took place years prior to appellant initiating this domestic proceeding in March 2010. After review of the evidence, the trial court stated:

> While [appellee] may ultimately inherit or be gifted an interest in this real estate investment, any such transfer would be her separate property. The Court has already found that [appellee] held no legal or equitable interest in this real estate investment at the time of the parties' instigating this legal action or at the time of the final hearing.
>
> Having considered all of the evidence presented as to the land in Mississippi and [appellee's] investment with her parents, the Court does not find that [appellee] has conducted financial misconduct or that [appellant] is otherwise entitled to equitable relief.

(Decree, 18.)

{¶ 40} Despite appellant's urging otherwise, we conclude the trial court's finding that appellee did not engage in financial misconduct with respect to the Mississippi property is not against the manifest weight of the evidence. Further, we find no abuse of the trial court's discretion in declining to find appellee engaged in financial misconduct or in declining to otherwise provide appellant with equitable relief regarding the Mississippi property. Accordingly, we overrule appellant's second assignment of error.

## C. Third Assignment of Error

{¶ 41} In his third assignment of error, appellant contends the trial court abused its discretion in concluding the condominium located in Louisiana was appellee's separate property.

{¶ 42} As is relevant here, "marital property" includes "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage," and "[a]ll interest that either or both of the spouses currently has in any real or personal property * * * and that was acquired by either or both of the spouses during the marriage." R.C. 3105.171(A)(3)(a)(i) and (ii). "Separate property" includes "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage" and "[p]assive income and appreciation acquired from separate property by one spouse during the marriage." R.C. 3105.171(A)(6)(a)(ii) and (iii).

{¶ 43} A party who wants an asset classified as separate property bears the burden of tracing that asset to his or her separate property. *Alexander v. Alexander*, 10th Dist. No. 09AP-262, 2009-Ohio-5856, ¶ 24, citing *Dunham v. Dunham*, 171 Ohio App.3d 147, 2007-Ohio-1167, ¶ 20, 26 (10th Dist.). When parties contest whether an asset is marital or separate property, the presumption is that the property is marital, unless proven otherwise. *Id.*, citing *Miller v. Miller*, 7th Dist. No. 08 JE 26, 2009-Ohio-3330, ¶ 20. On appeal, our job is not to reweigh the evidence, but to determine whether there was competent, credible evidence to support the trial court's findings. *Id.*, citing *Dunham* at ¶ 27. With this standard in mind, we examine the trial court's designation of the condominium as appellee's separate property.

{¶ 44} Appellant does not dispute that appellee and her brother purchased the condominium in 1992. Appellee currently holds a 50 percent interest in the property that

is being used as a rental property.  The trial court determined the condominium's current value is $165,000 and that in recent years, appellee's brother has claimed all income and expenses on his income tax returns.  The trial court found appellee "testified credibly that no marital funds have been invested in the property, that she has not personally expended any work improving or repairing the property and that the mortgage has been paid by the cash flow."  (Decree, 10.)  The court also found that repairs and upgrades to the condominium were accomplished by using the condominium's equity and the refinancing of a previous mortgage.

{¶ 45} According to appellant, the evidence established that appellee created a legal interest in the property for him when she forged his signature on various refinancing documents and took out funds beyond the amount owed on the mortgage.  The trial court noted appellee's conduct regarding the refinancing and specifically concluded that the money from the refinancing was used to pay the balance owed on the mortgage with money "pulled out for repairs and upgrades." (Decree, 10.)

{¶ 46} As noted previously, the trial court found appellee's testimony credible and concluded the Louisiana condominium was her separate property.  In applying a manifest weight standard of review, we defer to the trial court's decisions regarding the credibility of the witnesses and the weight to be given the evidence.  *Alexander* at ¶ 29, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77 (1984).  A review of the record indicates the trial court's designation of the condominium as appellee's separate property was supported by competent, credible evidence and is not against the manifest weight of the evidence.  Accordingly, we overrule appellant's third assignment of error.

### D.  Fourth Assignment of Error

{¶ 47} In his fourth assignment of error, appellant contends the trial court erred in awarding $40,000 in attorney fees to appellee.  The trial court stated that, except as otherwise ordered, the parties would be responsible for their own fees associated with the action.

{¶ 48} "In an action for divorce, * * * a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable.  In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct

of the parties, and any other relevant factors the court deems appropriate."   R.C. 3105.73(A).  "An award of attorney fees is generally within the sound discretion of the trial court and not to be overturned absent an abuse of discretion."   *Wagenbrenner v. Wagenbrenner*, 10th Dist. No. 10AP-933, 2011-Ohio-2811, ¶ 19, citing *Shirvani v. Momeni*, 10th Dist. No. 09AP-791, 2010-Ohio-2975, ¶ 22.

{¶ 49} In awarding appellee $40,000 in attorney fees, the trial court's decision reveals the court considered the marital assets, the parties' incomes, the temporary orders providing for spousal support, the conduct of the parties, and the reasonableness of the fees.  Appellant first argues the trial court erred in referring to the $75,715.08 appellee incurred in attorney fees through February 21, 2013 because this amount does not reflect the amount of attorney fees outstanding.   According to appellant, if the amount outstanding were known, then it would be known what amount of attorney fees appellee paid with marital income.   R.C. 3105.73(A) does not require use of an *outstanding* balance, nor has appellant provided any legal support or citation for his proposition that the trial court should have only considered the amount of attorney fees *not yet* paid. Additonally, the $75,715.08 amount did "not include costs and fees incurred subsequent to [February 21, 2013], including the extraordinary preparation time required by [appellant's] last minute inclusion of an out of state real estate appraiser during the course of the trial."  (Decree, 46.)  Thus, we find no abuse of discretion in the trial court's utilization of the $75,715.08 amount.

{¶ 50} Appellant next argues that, because the trial court equitably divided the parties' assets and liabilities in its final order, the court was "arguably precluded" from considering the factors of R.C. 3105.73 in favor of either party.  Again, appellant provides no support for this assertion.  As indicated above, R.C. 3105.73(A) establishes that "[i]n an action for divorce, * * * a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable.  In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate."   This is precisely the action undertaken by the trial court in this case, as the trial court expressly considered R.C. 3105.73(A) and, thereafter, concluded an award of attorney fees was warranted.

{¶ 51} Appellant also contends the attorney fees award is not equitable in light of the division of the parties' assets and liabilities and in light of the fact that appellee engaged in misconduct that caused both parties to incur increased attorney fees. In considering the conduct of the parties, the trial court noted appellant's late or failed attendance for court appearances, failure to pay the GAL, change of counsel "several times" during the course of the action, multiple continuance requests, and his untimely and lacking discovery responses. The trial court also recognized that appellee was "not without fault" and referred to her attempts to damage appellant's professional career and obtain employment.

{¶ 52} Nonetheless, appellant argues the trial court failed to give sufficient consideration to appellee's conduct. " 'Because a court addresses an award of attorney fees through equitable considerations, a trial court properly can consider the entire spectrum of a party's actions, so long as those actions impinge upon the course of the litigation.' " *Wehrle v. Wehrle*, 10th Dist. No. 12AP-386, 2013-Ohio-81, ¶ 50, quoting *Padgett v. Padgett*, 10th Dist. No. 08AP-269, 2008-Ohio-6815, ¶ 17; *see also Wolf-Sabatino v. Sabatino*, 10th Dist. No. 10AP-1161, 2011-Ohio-6819, ¶ 105; *Farley v. Farley*, 10th Dist. No. 99AP-1103 (Aug. 31, 2000) (stating the trial court was in a better position to determine the extent to which one party's conduct was responsible for increasing litigation expenses).

{¶ 53} Upon review of the trial court's detailed analysis pertaining to R.C. 3105.73(A), we do not discern an abuse of the trial court's discretion in awarding $40,000 in legal fees to appellee. Accordingly, we overrule appellant's fourth assignment of error.

### E. First Cross-Assignment of Error

{¶ 54} In her first cross-assignment of error, appellee asserts the trial court erred and abused its discretion when it determined $57,636.92 of the balance owed on the PNC line of credit was subject to marital distribution.

{¶ 55} Appellant testified the PNC line of credit was used to pay for the balance owed on the practice, Cardiovascular Care Unlimited, when he purchased it. The original outstanding balance in 2008 was $200,000, but there was no documentation regarding the balance owed as of the sale of the practice in July 2011 or on September 30, 2012. The trial court stated:

> Despite agreement that the $30,000 deposit from sale [of the practice] would be held in [appellant's] attorney trust account, [appellant] testified that he received the money (after filing a *Motion for Release from Restraining Order*) and claims to have paid this towards the outstanding balance. [Appellant] has never verified that these funds were deposited into his attorney's trust account, or provided an accurate accounting of the distribution of these funds. The evidence shows that the balance as of January 11, 2012 (the earliest documentation presented) was $57,636.92. * * * This same document shows a payment of $30,124.51 paid on the account on December 24, 2011. [Appellant] testified that this was the $30,000 paid from his attorney's trust account, but failed to explain the $124.51. In any event, the Court finds that the [appellant] received $30,000 pursuant to the terms of the Asset Purchase Agreement * * * and has paid that amount towards the PNC business line of credit which was a marital liability.

(Emphasis sic.) (Decree, 14.)

{¶ 56} According to appellee, the trial court erred because appellant testified that in August 2010 he drew $49,000 on this line of credit and gave the money to his attorney to hold in his trust account. Because appellee was unaware of and received none of these funds, she argues the balance of marital debt should be only $8,636.92, rather than $57,636.92. Appellant testified the amount given to his attorney in August 2010 was "[m]aybe 48, 49,000, something like that." (Tr. Vol. II, 451.) Appellant then testified he could not say exactly what the entire amount was, but that it was "around 48, 49,000 in total." (Tr. Vol. II, 454.) Appellant also testified the amount was "$45,000 in the fall of 2010," that was "[e]scrowed in one lump sum." (Tr. Vol. II, 456.) The following exchange occurred with the court:

> [The Court]: When you took the $45,000, did that come from the line of credit?
>
> [Appellant]: The $45,000 came from a salary advance from the line of credit, correct.

 (Tr. Vol. II, 458.)

{¶ 57} Appellant then testified, "Actually, I can't remember if it was paid from the line of credit or from the checking account from the practice, but it was treated as expense income from me in that tax year." (Tr. Vol. II, 459.)

{¶ 58} Based on this testimony, the trial court's decision states:

> [Appellant] took a salary advance of $45,000 and paid his attorney Sanjay Bhatt an initial retainer fee in 2010. It is not clear whether this was withdrawn directly from the business checking account or the PNC line of credit. Moreover, it is not clear that if it was withdrawn from the checking account that it caused a shortage which later required withdrawals from the PNC line of credit.

(Decree, 44.)

{¶ 59} There is no evidence in the record definitively establishing whether the $45,000 funds came from the line of credit or from a salary advance that affected the outstanding balance on the PNC line of credit. Accordingly, we find no abuse of discretion in the trial court's decision not to deduct $49,000 from the documented $57,636.92 balance. Accordingly, we overrule appellee's first cross-assignment of error.

### F.  Second Cross-Assignment of Error

{¶ 60} In her second cross-assignment of error, appellee contends the trial court erred and abused its discretion when it included $224,931 given to her parents as an asset to her. According to appellee, she gave her parents only $187,000 during 2006 and 2007 and that throughout the marriage they financially contributed to appellant's parents, including giving his mother $150,000 to purchase a new home.

{¶ 61} The trial court's decision states:

> [Appellee] has given her parents approximately $224,931 which includes payments to lawyers, direct payments to her father and payments on the real estate investment noted above. * * * [Appellee] argues that she has always believed in her father's innocence and that such support is part of the parties' culture as is evidenced by the fact that [appellant] also made financial contributions of marital funds to his mother including contributions for her retirement and the purchase of her home. [Appellant] does not dispute [appellee's] testimony and it is clear that these support/gifts were conducted with [appellee's] prior knowledge, if not her explicit agreement. Moreover, [appellee's] siblings also contributed to their parents during this time period although amounts of their contributions were not disclosed.
>
> The Court is inclined to believe that the support of parents and/or extended family is part of the parties' culture and

should not under most circumstances be considered *per se* financial misconduct. It does not appear that [appellee's] gifts did not affect the day to day welfare of this family. That said given their frugal financial dealings, the parties would have likely invested these funds and they would have been available for distribution in this divorce. Moreover, as previously indicated, [appellant] believed that the parties' marital financial arrangement (albeit not necessarily by agreement) was for [appellee] to invest her income for their immediate family's future benefit while [appellant] was responsible for the family's primary living expenses. [Appellee's] failure to obtain [appellant's] consent or even to discuss the gifting of these significant marital funds, (especially knowing his feelings about her father's indictment) while not considered financial misconduct shall be given equitable consideration by this Court.

(Decree, 18-19.)

{¶ 62} Thus, the trial court clearly considered the amounts contributed to appellee's parents during the relevant time frames, and the trial court took into consideration financial contributions made to other family members, including those in appellant's family. Despite appellee's assertion otherwise, the trial court concluded appellee was aware of the financial contributions made to appellant's family. As stated earlier, we defer to the trial court's determinations regarding the credibility of the witnesses and the weight to be given the evidence. *Alexander* at ¶ 29, citing *Seasons Coal Co.*

{¶ 63} Upon review, we cannot conclude the trial court abused its discretion by including the $224,931 as an asset of appellee. Accordingly, we overrule appellee's second cross-assignment of error.

## V. CONCLUSION

{¶ 64} Having overruled appellant's four assignments of error and appellee's two cross-assignments of error, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is hereby affirmed.

*Judgment affirmed.*

TYACK and CONNOR, JJ., concur.

_____